STATE EX REL. BOTTOMLY, ATTORNEY GENERAL, RESPONDENT, *v.* JOHNSON ET AL., APPELLANTS.

(No. 8507.)

(Submitted September 25, 1944. Decided December 29, 1944.)

[154 Pac. (2d) 262.]

*Murch & Wuerthner* and *Geo. E. Hurd,* all of Great Falls, for Appellants.

*R. V. Bottomly,* Attorney General, and *Clarence Hanley* and *P. J. Gilfeather,* Assist Attorneys General, for Respondent.

*Messrs. Murch & Wuerthner* and *Mr. George E. Hurd,* for Appellants, submitted an original and a reply brief; *Mr. Hurd* argued the cause orally.

*Mr. R. V. Bottomly,* Attorney General, *Mr. Clarence Hanley* and *Mr. P. J. Gilfeather,* Assistant Attorneys General, for Respondent, submitted a brief; *Mr. Hanley* argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

Defendants Henry Johnson and Mamie Johnson, owners, and the Brotherhood of Taxicab Owners and Drivers, a corporation, the lessee, appeal from a decree abating as a nuisance certain store building premises in the city of Great Falls. The chief specifications of error are that the complaint does not state a

cause of action, and that the evidence is not sufficient to support the findings of fact, conclusions of law and judgment.

Appellant's brief does not argue the sufficiency of the complaint, but accepts the fact that the complaint was held sufficient by this court in *State ex rel. Bottomly Attorney General v. District Court,* 115 Mont. 400, 143 Pac. (2d) 559, 560, in which proceeding the respondent was represented by defendants' counsel. We there held that although bona fide fraternal corporations, organized as was the defendant corporation, had been exempted from the operation of the anti-gambling laws in certain respects (Ch. 153, Laws 1937), yet the complaint stated a cause of action for the abatement, as a nuisance, of the conduct, maintenance and permission of gambling contrary to law, (sec. 11124, Rev. Codes), and that the complaint did not constitute an attack against the legal status of the corporation, which could only be attacked by *quo warranto* proceeding.

Defendants contended at the trial that since the corporation was organized as a fraternal organization, and since the validity of its status as a corporation could be attacked only in *quo wrranto,* any inquiry into the corporation's method of conducting its gambling activities constituted a wrongful interference with its corporate affairs. However, that objection also was disposed of in *State ex rel. Bottomly* v. *District Court,* supra, in which this court said: "The question to be determined in this proceeding is, not whether the certificate of incorporation issued to the Brotherhood was obtained through bad faith or not, but whether the duly organized fraternal organization is permitting practices in its club rooms that are in violation of the gambling laws of this state. We think the Attorney General is entitled to present evidence as to such alleged violation."

The main question raised on this appeal is the sufficiency of the evidence. The record shows that while both the front and alley doors of the premises were kept locked and a man or woman guard was maintained at the front door, access was had through the alley door, which was opened from the inside by anyone nearby; that while in general only members were ad-

mitted some persons had been allowed to enter and to engage in gambling without becoming members, and others who did not belong to the organization upon their entry were readily made "members" by the issuance to each of a membership card upon the payment of twenty-five cents. One member testified that she had had several parties there for out-of-town guests; that "they were made members before they were entertained there." Another witness testified: "The 23rd day of August [1943] I received a membership card there for the sum of twenty-five cents." He testified also that on September 5, 1943, another of the days on which it is alleged that gambling was illegally conducted on the premises, he went to the place with three others; that "I got passes for the three boys, paid for them myself. * * * I just entered and said I would like to take these boys in with me and they said they will have to have a card, or a membership card, and at a quarter apiece they signed them up"; that the cards bore the signature or rubber-stamped facsimile signature of Busby, the president, but "anybody seems to issue cards * * *; they are already signed"; that the guard at the door had the cards and immediately issued them to applicants on payment of twenty-five cents apiece; that "you enter and there is a small table right at the door where this girl stands, or man, who issues the passes and then takes the quarter for the pass." Asked whether "the minute a member accepts a card from a director or whoever might have it, and pays this twenty-five cents, he is a member and entitled to all the privileges of the club * * *," the president replied, "if the board of directors or membership committee doesn't reject him for special reasons. * * * Yes, if he is not rejected he stands as confirmed." At the times in question no written application for membership was required, according to the president.

An eighteen-year-old girl, and on another occasion an eighteen-year old boy, were allowed to play the slot machines but were required to buy cards, although according to the by-laws persons under twenty-one could not be admitted to membership. Numerous persons were shown to have received cards immediately

upon request without any preliminary other than the payment of twenty-five cents.

The evidence shows that certain gambling games, such as poker, pangeni, and "21" or black jack were run on concessions, the members not being allowed to play except in games conducted by experienced gamblers who were selected by the officers. The concessionnaires supplied "bank-roll," chips and paraphernalia, including, in the case of the "21" dealer, the table used. The official dealer or "dummy," who usually did not actually deal or play, sold chips to the players, redeemed them, and took from each pot a "rake-off" determined at the discretion of the dealer without any definite rules, but varying according to the size of the pot or the bets. At first the dealer or "dummy" in poker or pangeni received one-half of the proceeds of each game, and the other one-half went to the corporation. At another time, the one-half not taken by the corporation was divided "three ways," to pay the dealer, to apply upon the secretary's salary, and to apply on the principal and interest of a loan of some $2700, apparently made by one Gettel to the corporation. Later the dealer was reduced to compensation at the rate of $1 per hour. Relief dealers were provided by the management and received $1 per hour. The "21" or black jack operator, who provided his own table, received 75% of the earnings, the other 25% going to the corporation. There were some slot machines which belonged, not to the corporation, but to individual members. The proceeds of each machine were divided equally between the corporation and the owner.

The minutes of a directors' meeting held on August 6, 1943, shortly before operations were commenced, show action as follows:

"Motion was made, seconded and carried that if the Sheriff of Cascade County, Montana, enters the premises with a search warrant he must be warned not to molest any property and that he can legally enter only in daylight and by due process of law, and that officers of the corporation and floor attendants at the Club Rooms should be informed that a search and seizure

warrant may be served at any hour during the twenty-four, but that the nature of the warrant must be specified therein.''

At the close of the trial the judge announced, without objection from either party, that he saw no need for specific findings of fact and conclusions of law. After argument of counsel the court ruled as follows:

''If these proceedings are legal, then it seems to me that any person, a beer parlor or saloon, can form a fraternity and admit members by paying twenty-five cents and they can gamble among themselves. If this is legal, why, then the gambling laws of the State of Montana are wiped from the statute books, I think.

''The Court finds from the evidence that the fraternal organization involved here is not in good faith carrying out the purposes for which it was incorporated, that it has developed, not as a fraternal organization, but it has developed into a gambling club, it seems to me, and that illegal gambling is conducted as alleged in the complaint.

\*    \*    \*    \*    \*    \*

''I am basing this judgment, not upon non-members playing there, but the opinion of the Court is that the whole scheme of the Brotherhood in conducting their gambling at their club rooms is illegal, even when gambling among themselves.''

While thus the decision was not based upon mere ''non-members'' playing, it was obviously based upon the entire scheme of operations, under which the admission of ''members'' was a mere subterfuge and the gambling was thus not limited to nor for the amusement of bona fide members, but was operated as a business.

Formal findings of fact, conclusions of law and judgment were subsequently rendered. The court found generally that all the material allegations of the complaint were true, that the premises in question were at the times mentioned in the complaint maintained by the organization in violation of law with the knowledge of Henry Johnson, one of the owners. The conclusions of law are that the organization ''is not in good faith carrying out the

purposes for which it was incorporated, but at all times mentioned in said complaint, and subsequent thereto, has permitted and conducted gambling in violation of the laws of the state of Montana''; that the premises were and ever since August 23, 1943, had been a public nuisance which should be abated, and that the defendants should be permanently enjoined from maintaining gambling operations thereon. The judgment was entered accordingly, and provided that the premises be closed for a period of one year unless sooner released by the court. It provided also that the sheriff ''remove from said premises all fixtures, equipment and movable property used in conducting, maintaining or operating said gambling games, including all slot machines, sell the same in the manner provided by section 11129, Revised Codes of Montana, 1935, and use the proceeds of the sale therefrom in the manner provided by section 11130, Revised Codes of Montana, 1935.''

It is unnecessary to outline all the evidence, which is in some respects conflicting. Certain specifications of error are directed toward the admission of certain evidence, but it is unnecessary to consider them in detail. It is sufficient to say that without reference to the evidence objected to on other grounds than those disposed of above, there was ample competent evidence to sustain the allegations of the complaint, and the findings of fact, conclusions of law and judgment.

Defendants object to the general statement in the findings of fact that all the *material* allegations of the complaint are true. Although in general such statement is insufficient in a pleading by reason of the impossibility of determining what the pleader might consider material, it is obvious that the objection has no validity here, since any findings not inconsistent with the express findings and necessary to sustain the judgment must be presumed.

Defendants also object that the judgment is defective in that it does not sufficiently identify the fixtures, equipment and movable property used in conducting the gambling games and therefore to be sold by the sheriff. It is obvious that any

insufficiency in that respect cannot invalidate the judgment as a whole. Defendants contend that the judgment cannot be amended to correct the defect because the complaint itself fails to specify particularly the articles sought to be confiscated. It is not necessary to consider the contention, for evidence admitted without objection corrected the omission by sufficiently describing the gambling equipment used. The trial court is therefore directed to amend the same by describing the property found by it to have been so used and therefore subject to sale by the sheriff. We have examined the other specifications but find no reversible error.

The judgment appealed from is affirmed and the cause remanded to the district court for amendment of the judgment in accordance with this opinion.

ASSOCIATE JUSTICES ANDERSON, MORRIS and ADAIR concur.

Rehearing denied January 9, 1945.