STATE ex rel. REPLOGLE, County Attorney, Respondent

*v.*

JOYLAND CLUB et al., Appellants.

No. 8962
Submitted May 5, 1950. Decided June 30, 1950.
220 Pac. (2d) 988

Messrs. Greenan and Manion, Great Falls, for appellants. Mr. Howard T. Manion argued orally.

Mr. Arnold H. Olsen, Atty. Gen., Mr. Willis B. Jones, Mr. Harold L. Holt, Mr. Philip O'Donnell, Asst. Attys. Gen., Miss O. Louise Replogle, County Attorney, Mr. J. E. McKenna, Mr. Weymouth D. Symmes, Deputy County Attys., all of Lewistown, for respondent. Miss Replogle, Mr. Olsen and Mr. Symmes argued orally.

Mr. Thomas R. Marron, County Atty., Glasgow, Mr. Bert W. Kronmiller, County Atty., Hardin, Mr. Nat. A. Allen, County Atty., Ryegate, amici curiae.

THE HONORABLE C. E. COMER, District Judge, sitting in place of MR. JUSTICE BOTTOMLY, disqualified:

This is an appeal from a decree of the district court of Fergus county, the Hon. C. F. Holt, district judge presiding, ordering the confiscation of five coin-operated slot machines loaded with money and abating, as a nuisance, the premises on which the machines were being operated.

The premises consist of a parcel of land with a one-story frame building thereon owned by the defendants W. S. Shepherd and Ann LaMere, and situate near the outskirts of the city of Lewistown, in Fergus county, Montana.

In the beginning Shepherd and Mrs. LaMere owned and operated a public bar and restaurant on the premises so owned by them.

In April 1947, they organized and caused to be incorporated the defendant Joyland Club, a so-called "nonprofit organization" of which Shepherd is president and Mrs. LaMere secretary-treasurer. The third incorporator is Andrew Medvec, who was made vice-president, he being the son-in-law of the defendant Ann LaMere.

Following its incorporation Joyland Club, by written agreement, leased a portion of the building from Shepherd and Mrs. LaMere, the lessors reserving therefrom the space occupied and used by them for the bar which the two lessors continued to own and operate in their individual capacity. In the same room with the bar and immediately adjacent thereto the club installed, kept and maintained two Mill-O-Matic coin-operated slot machines. One was a nickel machine,—the other a quarter machine. Both were purchased from the Lewistown Elks Club. On May 27, 1947, licenses for each of the two machines were issued by the state board of equalization under the provisions of Chapter 142, Session Laws of 1945, R. C. M. 1947, secs. 84-3601 to 84-3610.

In the same room housing the bar and slot machines, the club served meals, maintained card tables and provided an orchestra and floor space for dancing.

Shepherd was the manager in charge of the operation of the club and Mrs. LaMere actively participated therein. The lease agreement provided that the club should pay to Shepherd and to Mrs. LaMere a salary of $200 per month, each, and that it should also pay to them a rental of $300 per month for the space which the club occupied.

Shepherd testified that the profits to be earned by the club were to be donated to The Montana Children's Home, a charity located in Helena, Montana. He also testified that the club's operations covering a period of more than three months were in the "red" paying out more money than it took in; that the club had never made any profits and hence had made no donation of any sort to the designated charity nor to any other charity.

On September 11, 1947, the club obtained and installed in the establishment three additional slot machines, being a quarter, a dime, and a nickel machine. These additional slot machines were obtained from the Helena Novelty Company, represented to be a partnership, with headquarters in and operating out of Helena, Montana. These three additional slot machines were delivered to defendants in Fergus county by a Mr. Mitchell, since deceased,

who, as an agent or employee of the Helena Novelty Company, brought them to Lewistown by truck and there set them up in defendants' place of business with the understanding that the club was to pay to the Helena Novelty Company, out of the earnings, an unstated amount to be accounted for or paid each month. No licenses were issued or obtained for the three additional slot machines nor did the club ever pay for the machines nor were such machines the property of the club when seized.

On September 13, 1947, the defendants placed, maintained and kept under their management and control in their place of business the two licensed slot machines, the three unlicensed slot machines, as well as certain games played with cards known as blackjack and twenty-one, all of which were played by numerous and divers persons during the evening of September 13, 1947.

At about eleven o'clock on the night of September 13, 1947, a deputy sheriff of the county, armed with a warrant of arrest for defendants and a search warrant for the premises, and accompanied by the chief of police and assistant chief of police of Lewistown, and the county attorney of Fergus county, raided the establishment,—arrested the defendants, W. S. Shepherd and Ann LaMere, and seized and took into their custody, the five slot machines then loaded with money.

Thereafter on appropriate proceedings instituted in the district court and trial had before the district judge, sitting without a jury, decree was rendered and entered against defendants.

The decree: (1) Enjoins defendants from operating on the premises slot machines or any other gambling device of any kind or nature for a period of one year; (2) orders the sheriff to immediately take into his possession the five slot machines, together with their contents and to *sell* the machines as provided by law and to deliver the proceeds together with the money in the machines to the county treasurer to be paid into the proper fund as provided by law; (3) orders that the premises be vacated by all persons; (4) directs that the sheriff forthwith lock and seal the building and property and keep same under lock and sealed for

one year; and (5) adjudges that plaintiffs have judgment against defendants for plaintiff's costs.

From such decree the defendants Joyland Club, W. S. Shepherd and Ann LaMere have appealed.

The district court made and filed written findings of fact and conclusions of law. Therein it found that in operating and maintaining the slot machines defendants were conducting a public nuisance. The decree entered is in form and substance the same as that entered in the case of State ex rel. Bottomly v. Johnson, 116 Mont. 483, 154 Pac. (2d) 262.

Defendants assert that it was error for the trial court to so find and determine, contending that defendants were accorded the legal right to use, operate, keep and maintain slot machines by virtue of the provisions of Chapter 142, Session Laws of 1945, and particularly section 3 thereof and they pose the question: Does the using, operating, keeping and maintaining for use, of slot machines, constitute a nuisance that is subject to abatement under the laws of Montana?

Chapter 24, of Title 94, R. C. M. 1947, sections 94-2401 to 94-2428, is entitled "Gambling."

Section 94-2409 provides: "Any article, machine or apparatus maintained or kept in violation of any of the provisions of this act is a public nuisance, but the punishment for the maintaining or keeping of the same shall be as provided in this act."

This court long since held that operating and maintaining coin-operated slot machines constitutes gambling under the laws of this state.

Almost half a century ago this court, speaking through Mr. Chief Justice Brantly, in State v. Woodman, 1902, 26 Mont. 348, 67 Pac. 1118, sustained a conviction for the offense of "unlawfully running and conducting, and permitting to be run and conducted, a certain nickel in the slot machine for cigars in his [defendant's] cigar store in the city of Helena," as a violation of the Laws of 1901, page 166, entitled, "An Act to Prohibit Gambling Within the State of Montana," etc.

In State v. Hovland, 1946, 118 Mont. 454, 169 Pac. (2d) 341, this court sustained a judgment of conviction for the offense of "willfully, unlawfully, and wrongfully operating and running, 'as the owner' a [certain] slot machine for money" and held the evidence in the record sufficient to warrant the jury in finding defendant guilty of running the slot machine contrary to Chapter 153, Laws of 1937.

Marvin v. Sloan, 1926, 77 Mont. 174, 250 Pac. 443, 445, involved a mint vending machine paying the "prize" in trade checks instead of money. The county attorney and sheriff had threatened to confiscate the machine and to arrest the operator when enjoined from so doing by an injunction issued out of the district court. This court dissolved the injunction against the officers, reversed the judgment and remanded the cause with directions to the district court to dismiss the suit against the law enforcement officers, and, speaking through Mr. Chief Justice Callaway, said: "Undoubtedly the machine in question is a gambling device within the contemplation of section 11159, supra [Rev. Codes 1921]."

In Dorrell v. Clark, 1931, 90 Mont. 585, 4 Pac. (2d) 712, 714, 79 A. L. R. 1000, the sheriff of Wheatland county seized two slot machines which had been installed in Dorrell's billiard parlor under an agreement that he would "pay" to the owner 25 % of the money the machines took in, and arrested Dorrell who pleaded guilty to the crime of operating such machines. The district court ordered that the money found in the machines be deposited with the clerk of the court and that the machines *be destroyed*. Dorrell demanded that the money be turned over to him and upon the clerk's refusal he instituted suit to recover the money, alleging that he was entitled to the "immediate possession" of it. The point in dispute on the appeal was whether sections 11166 and 11167 of the Penal Code of 1921 were broad enough to permit the confiscation and destruction of the machines and whether the operator Dorrell was entitled to have the money returned to him. This court in affirming the judgment of the trial court, said: "The judgment is in conformity with the

public policy of the state and of good morals.'' This court there further said, 90 Mont. at page 589, 4 Pac. (2d) at page 713, 79 A. L. R. 1000: ''It is first apparent that the sheriff did not wrongfully seize the money in question. The statute authorized him to seize the slot machines in operation. * * * Clearly, these were what is known as 'money machines' and were operated by placing a coin in a slot and manipulating a lever, when the coin became a part of the device for operating the machine and if, perchance, the operator was lucky, it released other coins from the internal workings of the machine and expelled them there from. Under such circumstances, the coins, and all of them, were as much a part of the gambling device as was the lever, or dials, or slot; the machines could not be operated without their use, and the machines, as they were when seized by the sheriff, could not 'pay' except for the coins therein. When, therefore, the sheriff carried away the machines as he found them, he committed no trespass—he but performed a duty imposed upon him by law.''

In State v. Johnson, 52 N. M. 229, 195 Pac. (2d) 1017, 1020, the court said:

''Appellants not only urged the restoration of the gambling paraphernalia and devices, but tersely pose the question: If the money is not to be restored what disposition will the court make of it? A sufficient answer is that when the money was placed in the slot machines and set aside as an inducement to play them, it became a component part of such gambling devices, contraband, and subject to seizure. The use of the money thus made by the appellants, resulted in a forfeiture of their dominion and ownership of it, and they cannot now make inquiry concerning its disposition.

''That money, segregated as gambling paraphernalia, cannot be restored to the former owner is a recently announced doctrine. See Dorrell v. Clark, 1931, 90 Mont. 585, 4 Pac. (2d) 712, 79 A. L. R. 1000, where the authorities are assembled. Courts of other jurisdictions have followed in rapid succession the reasoning of the Montana court, and courts now generally hold, and we

think properly so, that money, which has been ear-marked as an integral part of gambling equipment, may be seized as a gambling device. Moore v. Brett, 193 Okl. 627, 137 Pac. (2d) 539; State v. McNichols, 63 Idaho 100, 117 Pac. (2d) 468; Fairmont Engine Company v. Montgomery County, 135 Pa. Super. 367, 5 A. (2d) 419; People v. Krol, 304 Mich. 623, 8 N. W. (2d) 662; State v. Klozar, Ohio App., 46, N. E. (2d) 474; Kenny v. Wachenfeld, 184 A. 737, 14 N. J. Misc. 322.

"We approve the doctrine. Appellants have forfeited their ownership of the money and having thus forfeited it, are in no position to assert a claim of ownership, nor can they enlist the aid of the court even for the purpose of an inquiry when they must, as a basis of their claim, show that the money was being used by them in an illegal manner."

In the recent case of State v. Las Cruces Elks Club of Benevolent & Protective Order of Elks et al., 1950, 54 N. M. 137, 215 Pac. (2d) 821, the Supreme Court of New Mexico said:

"Following a raid by the Sheriff's force and members of the State Police on the club rooms of the intervenors in Las Cruces where a number of slot machines loaded with money were seized from a back room where they were for the time apparently stored, the District Attorney filed a petition in the District Court asking that they be ordered destroyed on the grounds that they were gambling paraphernalia, that their possession was unlawful under Section 41-2201, 1941 Compilation, and a public nuisance; and further that their possession was detrimental to the general welfare of the people of Dona Ana county and of the State of New Mexico.

"The Elks Club and the Legion Post were permitted to intervene and set up their ownership of a number of the seized slot machines and resist the granting of the petition for their destruction. * * *

"Upon a consideration of the pleadings and the argument of counsel, the District Court entered an order directing the officers to destroy the slot machines, and this appeal followed.

"The intervenors (appellants), recognize the fact that they have no more right to operate a slot machine or other gambling device than the most humble citizen of the state, notwithstanding the fact that, according to press reports, one district attorney who should have known better, was recently quoted as stating that he did not believe the antigambling laws applied to fraternal organizations or clubs. * * *

"Ballentine's Law Dictionary, p. 1210, defines a slot machine as a gambling device, but public knowledge that slot machines are gambling devices is so universal that it seems a waste of time and space to cite authorities to that effect. * * *

"The term 'gambling paraphernalia' sufficiently described these one-armed bandits, and the judgment will be affirmed."

In State ex rel. Dussault v. Kilburn, 1941, 111 Mont. 400, 109 Pac. (2d) 1113, 135 A. L. R. 99, this court held that the pin ball machine involved was a gambling device, the operation whereof was properly enjoined as a nuisance under the provisions of section 11124, R. C. M. 1935, defining a nuisance, and under the provisions of section 11159, R. C. M. 1935, as amended by the so-called "Hickey Law," being section 1 of Chapter 153 of the Session Laws of 1937.

State ex rel. Leahy v. O'Rourke, 1944, 115 Mont. 502, 146 Pac. (2d) 168, 169, was an appeal from a judgment in an action brought under section 11124, R. C. M. 1935, to abate a gambling nuisance. The action was tried to the court without a jury and findings made holding the defendants guilty of maintaining a nuisance, enjoining the continuance thereof, followed by a judgment abating such nuisance and closing the premises for one year. On the appeal this court said: "The nuisance statute, section 11124, Revised Codes [1935] under which the present action was prosecuted, is intended to reach all forms of gambling, *including lotteries,* which are prohibited by section 11149 et seq. as well as the many forms of gambling enumerated in and prohibited by section 11159 et seq. The game of 'Keno' as played and carried on * * * constituted a nuisance which might be en-

joined and prevented by equity suit as in this case. The statute law giving the remedy, chapter 29, Penal Code, secs. 11123-11133, Revised Codes, declares that gambling, when carried on at any particular place, is a nuisance and provision is made for its abatement and prevention. By section 11124, every building or place used for such purpose is declared to be a nuisance which it says shall be enjoined and abated and prevented." Emphasis supplied.

Defendants in the case at bar rely upon State ex rel. Stewart v. District Court, 77 Mont. 361, 251 Pac. 137, 49 A. L. R. 627, 629, contending that thereunder there must be proof of what the law denominates nuisances as distinguished from a mere crime.

Under the law of Montana the operation, possession and maintenance of slot machines is gambling and gambling under these same laws constitutes a public nuisance. While the Stewart Case, supra, holds that in the absence of statutory authority a court of equity will not exercise jurisdiction to prevent the commission of a crime, it also clearly holds that a court of equity has jurisdiction, at the suit of the state, to enjoin a public nuisance although the act constituting such nuisance be also a crime.

Defendants urge that the law does not authorize the substitution of a civil proceeding for a criminal action nor the substitution of a single judge for a jury and that in these proceedings defendants constitutional privileges have been invaded.

None of the defendants' constitutional rights have in any wise or manner been invaded by the proceedings here reviewed. As pointed out from the bench during the oral argument of this appeal the laws and procedure pertaining to abatements were enacted for the purpose of eliminating and prohibiting public nuisances. Those engaged in prohibited and illegal practices and business characterized and designated by the enactments of the state legislative assembly as a public nuisance must anticipate that they may be held answerable under such abatement laws. The laws governing abatement have been in full force and

effect in this state for almost half a century. These laws have long been applied by the courts of this state in cases properly coming within their purview and the decisions of this court on review are in harmony with those of the courts generally of other jurisdictions. See: 46 C. J., Nuisances, p. 760, sec. 367; 39 Am. Jur., Nuisances, pp. 295, 454, 462, secs. 14, 183, 187; State v. Johnson, supra; State v. Las Cruces Elks Club of Benevolent & protective Order of Elks et al., supra.

Two of the seized machines had been kept, displayed, maintained, operated and played for money in the building° on the described premises from the month of May 1947 to the hour of 11 o'clock p. m. on September 13, 1947, the day and hour of the raid by the local law enforcement officers, and the other three machines had been and were being used in the same way, all being played by, for and with United States coins from at least about the hour of 6:00 p. m. of September 13, 1947, to the hour of 11:00 p. m. of that day. There was continuous possession and more or less continuous use and playing of the two first acquired slot machines for months.

The witness Lehman testified he was not a member of the Joyland Club but was admitted thereto during the evening of September 13, 1947, and, with a companion, placed coins in and played the five slot machines. As to the manner of playing he testified: "Well put in a coin and pulled a lever, put the coin in the top of the machine." The witness had $25 when he entered the defendant club and at the time of the raid at 11:00 o'clock that night his playing had reduced his capital to but $2.35. Numerous other persons were playing the machines also.

That such operations constitute a nuisance which may be abated under the laws of this state is clear.

In 1895 the state legislative assembly enacted section 600 of the Penal Statutes of 1895 prohibiting gambling in this state. The statute, *inter alia*, applied to "*every preson* * * * who conducts * * * any game of faro, monte, roulette, lansquenet, rouge et noire, rondo, tan, fantan, stud-horse poker, draw poker, craps,

seven-and-a-half, twenty-one, or any banking or percentage game played with cards, dice, *or any device for money,* checks, credit or any representative of value * * *'' Emphasis supplied.

In 1897 the state legislative assembly enacted a more comprehensive and drastic anti-gambling statute, being Senate Bill No. 28, Session Laws of 1897, pp. 80-83, section 1 whereof provides, *inter alia,* that: ''Every person who * * * conducts * * * any banking or percentage game *or any game of chance* played with cards, dice *or any device whatever for money, checks, credits, or any representative of value· or for any property or thing whatever* is punishable by a fine of not less than five hundred dollars nor more than one thousand dollars, or by imprisonment in the State Penitentiary for a period of not to exceed five years and for the costs of the prosecution * * *.'' Emphasis supplied.

Section 2 of the above Act of 1897 provides: ''Every person who knowingly permits any of the games mentioned in the preceding section to be played, conducted or dealt ·in any house, room, tent or apartment owned or rented by such person, in whole or in part, is punishable by a fine * * * and such person shall be imprisoned until such fine and the costs of the prosecution are paid.''

In 1901 the state legislative assembly enacted Senate Bill No. 74, Session Laws of 1901, pp. 166-168, section 2 whereof makes it a crime and provides the penalty to be meted out to every person ''who runs or conducts any nickel-in-the-slot machine or * * * similar machine or permits same to be run or conducted * * *'' The case of State v. Woodman, supra, was prosecuted under the 1901 Act.

In 1907 the legislature enacted Chapter 115, Session Laws of 1907, section 1 whereof provides that any person who ''runs or conducts, or keeps *any slot machine, or other similar machine,* or permits same to be run or conducted, for money, checks, credits, or any representative of value, or for any property or thing whatever,'' is punishable by fine or imprisonment as therein prescribed. Section 2 of the 1907 Act additionally and separate-

ly prescribes punishment for "Any person who *has in his possession, or under his control, or who permits to be placed, maintained or kept* in any room, space, enclosure or building, owned, leased or occupied by him, or under his management or control, any * * * *slot machine* * * *." Section 7 of the 1907 Act provides that any article, machine or apparatus maintained or kept in violation of any of the provisions of the Act is a public nuisance.

It is apparent from the provisions of section 1 of the 1907 Act that the legislature intended to and that it made the *running or conducting* of any slot machine or similar device a separate offense, as distinguished from the mere *possession or maintenance* of such machines or similar devices. Section 2 of the Act prescribed punishment for any person who has *possession, control or who maintains* the outlawed devices, including slot machines. Here the legislature dealt with two distinct offenses: One, the *operation* of the machines and devices described in section 1, and the other, the *possession and maintenance* of the machines and devices described in section 2. See sections 8416 to 8436, R. C. M. 1907, inclusive.

In 1917 the state legislative assembly by the enactment of Chapter 86, Laws of 1917, amended section 8416, Revised Codes of 1907, supra, so as to prescribe punishment for the *operation or playing* of slot machines, the enactment being carried forward and embodied in sections 11159 to 11183, inclusive, of the Revised Codes of 1935.

Section 11159, Revised Codes of 1935, is complete in itself both as to the acts constituting the offense and the penalty therefor. It forbade the running, conducting or keeping by any person of any slot machine, punch board or other similar machine or device run or conducted for money or any representative of value.

Section 11160, Revised Codes of 1935, is also complete in itself both as to the acts constituting the offense and the penalty therefor. It forbade any person from having in his possession

or under his control or from permitting to be placed, maintained or kept in any room, space, enclosure or building, owned, leased or occupied by him, or under his management or control any slot machine.

Section 11159 and section 11160, R. C. M. 1935, applied to *all* slot machines operated or possessed within the state of Montana by any and *all* persons save and except *only* ''a public officer, or * * * a person coming into possession thereof in or by reason of the performance of an official duty and holding the same to be disposed of according to law.'' Sec. 11160, supra. The prohibition also applied to *all* punch boards, hence in the year 1935 there was no confusion,—no conflict in the law of this state which law clearly provided that *no person* could lawfully run or conduct any slot machine or punch board within the state of Montana.

In 1937 the state legislative assembly enacted the ''Hickey Law'' being Chapter 153 of the Session Laws of 1937. In section 1 of such Act the legislature retained and re-enacted substantially all of the provisions of section 11159, R. C. M. 1935, penalizing ''*Every person* * * * who runs or conducts or causes to be run or conducted, or keeps any slot-machine'' within this state. Immediately following the re-enactment of the prohibitions contained in section 11159, R. C. M. 1935, and in the same section and paragraph of the amendatory Act, the 1937 legislature inserted in the law the ''hickey'' proviso which is a *licensing* provision lifting the ban on dominos, checkers and certain card games upon the payment of a license fee and under prescribed conditions and permitting the use of ''trade stimulators, such as pull boards and ticket boards,'' also upon the payment of a license fee if and when used in conformity to the restrictions imposed by the Act.

In section 1 of Chapter 153, Session Laws of 1937, the legislative assembly appended to its re-enactment of substantially all of the provisions of section 11159, R. C. M. 1935, the ''hickey'' proviso reading: ''provided, however, that it shall be lawful for cigar stores, fraternal organizations, charitable organizations,

drug stores and other places of business, *upon the payment of a license fee therefor* * * * in the sum of ten dollars ($10.00) annually *per table* used or operated in such place of business, to maintain and keep for the use and pleasure of their customers and patrons, *card tables and cards* with which and at which *such games* as rummy, whist, bridge whist, black jack, euchre, pinochle, pangene, or pangeni, seven-up, hearts, freeze-out, casino, solo, cribbage, five hundred, penie ante, *dominos,* high-five and *checkers* may be played for pastime and amusement by customers who are not minors, and for the maintenance of which a charge may be made, to be paid by the users by the purchase of trade checks which must be redeemable in merchandise at the going retail price of such merchandise, which is the stock in trade of such business; and that places of business may, *upon the payment of a license fee* therefor * * * exhibit for use and sale to all customers not minors, *trade stimulators,* such as pull boards and ticket boards, where each board so used returns to the owner or business not to erceed the going retail price of the goods disposed of and sold and disposed of through the use of the same, and which goods * * * must not be other than the goods constituting the usual stock in trade of the business using the same.'' Emphasis supplied.

Section 2 of the ''Hickey Law'' provides that the license issued to each place of business ''shall show on the face thereof, *the number of card tables* for which *license* is paid, and the *trade stimulators,* if any, for the use of which *license* is paid.'' Emphasis supplied.

While the above quoted ''hickey'' proviso of the first section of the 1937 Act expressly *includes* and applies to ''cigar stores, *fraternal organizations, charitable organizations,* drug stores and other places of business, upon the payment of a *license* fee'' yet the third section of the Act provides: ''Section 3. That any religious, fraternal or charitable organization, and all private homes, *are not included within the provisions of this act.*'' Emphasis supplied.

When the 1937 legislative assembly expressly *included* in section 1 of Chapter 153 both fraternal organizations and charitable organizations, and in section 3 of the same Act, the same legislature also provided that they *"are not included* within the provisions of this act,"* what then was the legislative intent? Did such legislature intend to include *religious, fraternal or charitable organizations* and private homes, or did it intend to exclude them?

The legislative bill which became the "Hickey Law" was and is entitled: "An Act to Amend Section 11159 Revised Codes of Montana, 1935, Prohibiting Gambling Games, Said Amendment Providing for the Playing of Certain Games for Amusement and Pastime, and the Use in Places of Business Trade Stimulators Upon the Payment of a License to the County Treasurer, and Providing a Penalty for the Violation Thereof."

Both the title of the Act and its provisions only mention,— only amend,—and only affect section 11159, R. C. M. 1935.

The bill was clearly intended to amend and to add additional provisions to section 11159, as the title plainly states it is: "An Act to Amend Section 11159 Revised Codes of Montana, 1935, Prohibiting Gambling Games * * *" These words of the title evidence the legislative intent to amend section 11159, which section was one prohibiting gambling games. Thus are the words "Prohibiting Gambling Games" merely descriptive of the section (11159) which the legislature intended to amend.

What amendment did the legislature intend to make in or add to the existing law? Manifestly it intended that the amendment should add to the provisions of section 11159 the "hickey" proviso for the title to the bill states: "Said Amendment Providing for the Playing of Certain Games for Amusement and Pastime, and the Use in Places of Business Trade Stimulators *Upon the Payment of a License* to the County Treasurer, and Providing a Penalty for the Violation Thereof." The quoted words from the title of the 1937 Act are descriptive of the *amendment* which the legislature intended to make and which it did engraft upon

the existing law as contained in section 11159. The amendatory Act of 1937 made no reference to and it made no change in section 11160, R. C. M. 1935.

The "Hickey Law" is a *licensing* statute. It provides for the licensing of card tables. The *license* fee is $10 "annually *per table* used or operated" in the *licensed* place of business. The Act also provides for the *licensing* of "trade stimulators, such as pull boards and ticket boards." For these the *license* fee is also $10 annually. Upon the payment of the prescribed *license* fee the numerated "hickey" games are declared to be lawful. The enumerated "games" are dominos, checkers and certain games played with playing cards. Slot machines are not included among the enumerated "hickey" games accorded legislative blessing nor are slot machines included among the "trade stimulators" given legislative approval. The "Hickey Law," like section 11159, bans the operation of any and *all* slot machines by any and *all* persons and there is nothing in the "hickey" proviso that legalizes their operation.

Section 3 of the "Hickey Law" clearly states that "any religious, fraternal or charitable organization, and all private homes, are not included within the provisions of this act," meaning the *licensing* Act so authorizing the playing of the enumerated "hickey" games upon the payment annually of the required *license* fee *"per table* used or operated" in the place of business *licensed.* The legislature intended that neither religious, fraternal nor charitable organizations nor private homes should be required to pay any *license fee* to entitle them to enjoy the privilege of maintaining or keeping *tables* for the use and pleasure of their members playing such "hickey" games for they are not included within the provisions of such licensing Act.

The portions of section 11159, R. C. M. 1935, which were unchanged by Chapter 153, Session Laws of 1937, must be considered as having been the law from the time they were first enacted. State ex rel. Aeronautics Commission et al. v. State Board of Examiners, 121 Mont. 402, 194 Pac. (2d) 633, 641;

.Snidow v. Montana Home for the Aged, 88 Mont. 337, 344, 292 Pac. 722; State v. Yale Oil Corp. of South Dakota, 88 Mont. 506, 295 Pac. 255.

The general tenor and spirit of section 11159, R. C. M. 1935, ██ before its amendment by Chapter 153, Session Laws of 1937, prohibits any and all persons from running, conducting or causing to be run or conducted any slot machine. Nothing in Chapter 153 indicates an intention to change this long established government policy and the fact that the "hickey" proviso appended to section 11159, makes no mention whatever of slot machines, evidences an intention to fortify rather than weaken that declared policy. See In re Klune, 74 Mont. 332, 336, 240 Pac. 286. It is a well recognized rule that of two constructions either of which is warranted by the words of the amendment of a public Act, that is to be preferred which best harmonizes the amendment with the general tenor and spirit of the Act amended. In re Klune, supra.

R. C. M. 1947, sec. 43-510 provides: "Where a section or a part of a statute is amended, it is not to be considered as having been repealed [or] re-enacted in the amended form, but the portions which are not altered are to be considered as having been the law from the time when they were enacted, and the new provisions are to be considered as having been enacted at the time of the amendment."

Where, as here, the substance of section 11159, R. C. M. 1935, so far as it applies to slot machines was never changed, such unchanged portion of the Code section must be given the same meaning as it originally had.

Section 11160, R. C. M. 1935, has not been amended in any particular. It now is and at all times since its enactment by the 1907 state legislative assembly, has been the law of this state, being now section 94-2404 of the Revised Codes of 1947.

At the time of the passage of Chapter 153, Session Laws of ██ 1937, the legislature is presumed to have known of the ,existence of section 11160, R. C. M. 1935, which is presumed to be valid. If by the passage of Chapter 153 the legislature in-

tended to change the meaning of section 11160, supra, it is reasonable to suppose it would have employed definite language in so doing rather than by wholly omitting to make any reference whatever to such Code section. Northern Pac. Ry. Co. v. Dunham, 108 Mont. 338, 346, 90 Pac. (2d) 506.

In State v. Aldahl et al., 106 Mont. 390, 393, 78 Pac. (2d) 935, 936, this court construed the "Hickey Law," Chapter 153, Laws of 1937, supra, and held that the Act does not authorize the use of *trade checks* for *betting* purposes in the games enumerated in the Act, stating: "The first part of that chapter expressly prohibits it. The proviso, section 1, contains no language authorizing it."

Section 1 of the "Hickey Law," Chapter 153, Laws of 1937, provides that "every person who plays or bets at or against said prohibited games or devices, *except as hereinafter provided,* is guilty of a misdemeanor" and in construing the Act this court in the Aldahl case, supra, said: "* * * we find nothing in the act, except section 3 thereof, that can be said to relate back to the phrase 'except as hereinafter provided' and which can be said to authorize betting at any of the games enumerated. Defendants do not contend that they come within the provisions of section 3 of the act." Thus did this court decline to read into the "Hickey Law" any authorization not therein contained and particularly did it refuse to read into the law any authorization for operating or conducting any games of chance not clearly expressed in the language of the enactment.

In 1945 the state legislative assembly enacted Chapter 142, Laws of 1945, being another *licensing* statute. While this Act makes specific reference to section 11159, R. C. M. 1935, and to the "Hickey Law," Chapter 153, Laws of 1937, it is significant that it makes no mention whatever of section 11160, R. C. M. 1935, which then was and still is the law of this state. See R. C. M. 1947, section 94-2404.

The second section of Chapter 142, Laws of 1945, reads: "Section 2. The provisions of the so-called 'Hickey Law,' Section 11159, Revised Codes of Montana of 1935, as amended by Chap-

ter 153, Session Laws of Montana of 1937, *prohibiting the running, keeping or operating of slot machines, are hereby declared to be in full force and effect."* Emphasis supplied.

The only mention made of slot machines in the "Hickey Law" is found in section 1 of that law and that section specifically prohibits, makes it a public offense and prescribes the penalty for any person who runs, conducts or keeps slot machines.

The above prohibition of the "Hickey Law" against the running, keeping or operating of slot machines was, by the 1945 state legislative assembly, in section 2 of Chapter 142, Laws of 1945, "declared to be in full force and effect."

Section 1 of Chapter 142, Laws of 1945, reads: "Section 1. No slot machine shall hereafter be used, operated, kept or maintained for use or operation within the State of Montana by any person or persons whomsoever save and except as in this act provided. In addition to its ordinary meaning the word 'persons' includes both natural and artificial persons and embraces all partnerships, corporations, associations, societies and all other persons of every sort and kind."

Thus does section 2, declaring the "Hickey Law" to be in ▮▮ full force and effect, supplemented by section 1 of Chapter 142, Laws of 1945, as well as section 94-2404, R. C. M. 1947, prohibit *all* persons, including partnerships, corporations, associations and societies from keeping or possessing slot machines within the state of Montana.

While section 23, Article V, of our Constitution, requires that the subject of legislation shall be clearly expressed in the title, yet the title of this Act, Chapter 142, Laws of 1945, says nothing about the granting of any authority to anyone to operate, use, maintain or possess slot machines. The title relates solely to the *licensing* of slot machines and the manner of obtaining the *license*. Had it been the intent of the state legislature to authorize nonprofit organizations to operate or maintain or possess slot machines, it no doubt would have said so, at least in the title of the Act.

Section 23 of Article V of our Constitution has been strictly ██ construed by this court. See Coolidge v. Meagher, 100 Mont. 172, 46 Pac. (2d) 684, and other cases cited in the annotation to said section of the Constitution. Should this court hold that Chapter 142 not only provides for *licenses* of slot machines by ''nonprofit'' corporations but that it also makes legal their operation, then all of said Chapter 142 would be void as containing within its purview more than one subject, contrary to the provisions of said section 23, Article V of the Constitution.

Considering the history of our gambling laws and particularly those relating to slot machines and that from the year 1901 to the year 1937, the possession, operation and maintenance of slot machines was made an offense punishable by fine or imprisonment or both, by confiscation of the gambling apparatus,—by the destruction of the devices and the abatement and the closing of the premises where the gambling is carried on, and also the effect of the ''Hickey Law'' enacted in the year 1937, we conclude that if, by the enactment of said Chapter 142 of the Laws of 1945, it was the intent to authorize so-called ''nonprofit'' corporations to maintain, use and operate slot machines, the legislative assembly would have said so in plain and unambiguous terms and words, rather than leave it to the courts to insert such authority in the statute by judicial interpretation. Should such authorization be now inserted in the provisions of Chapter 142, Laws of 1945, by court decision, it would constitute judicial legislation which is prohibited both by statutory and constitutional provisions.

Defendants here seek to have the courts of the state, by judicial construction, do for them that which the legislature has thus far declined to do by legislation. It is undoubtedly the function of courts to interpret the language of statutes where the meaning thereof is not clear, but this is not a question of interpretation. Here the defendants seek to have the court insert something in the statute which is not there and which cannot be found by any judicial magnifying glass. Be-

fore "nonprofit" corporations may be given the authority to maintain, use, or operate slot machines, free from the penalties and abatement provided, the people of this state must first speak on the subject and grant such authority in a constitutional manner. It is neither the function nor the province of the courts to assume to grant such authority by judicial legislation.

Defendants urge that the Joyland Club is a "non-profit organization" and that its authority to keep and operate slot machines is granted by section 3 of Chapter 142, Laws of 1945, which provides: "Section 3. Religious organizations, fraternal organizations, charitable, or nonprofit organizations, before using, operating, keeping and maintaining for use, slot machines, must first procure the *license* and pay the *license* fee provided by this act, provided however, that such religious organizations, fraternal organizations, charitable or nonprofit organizations are the sole and complete owners of said slot machines, and that the entire profit, if any therefrom, shall go to said organizations." Emphasis supplied.

Joyland Club is neither a religious, fraternal nor charitable organization nor does it claim to be such.

There is nothing in the above section, nor is there anything in any other part of Chapter 142, Laws of 1945, that authorizes "nonprofit" clubs, organizations or corporations to either use, operate or possess slot machines.

Chapter 142 is a *licensing* statute. This is apparent from both the title and the provisions of the Act. The title of the Act reads: "An Act Relating to the Licensing of Slot Machines; Providing for a State License and Optional County and City Licenses and for the Payment of License Fees for the Possession, Use or Operation of Slot Machines by Religious, Fraternal or Charitable, or Nonprofit Organizations; Providing Penalties for the Violation of this Act and Procedure for the Enforcement Thereof by the State Board of Equalization; Defining the Terms Used in This Act; Prohibiting Minors from Playing Slot Machines; Making an Appropriation to Carry Out

the Provisions of This Act and Repealing All Acts and Parts of Acts in Conflict Herewith.''

The payment of a license or tax upon a business prohibited by statute is no justification for doing the forbidden act.

In Pepple v. Headrick, 64 Idaho 132, 128 Pac. (2d) 757, 762, wherein a pin ball machine was held to be a gambling device, the court said: ''The payment of taxes on, or licensing of, a gambling machine or device, furnishes no defense or justification for its operation in violation of the anti-gambling laws.''

In Hinkle v. Scott, 211 N. C. 680, 191 S. E. 512, 513, the court said: ''The payment of State and county license tax on slot machines would not justify the operation of those machines which come within the definition of unlawful devices set forth in the statutes.''

Ingram v. Bearden, 212 S. C. 399, 47 S. E. (2d) 833, 835, holds ''that the mere licensing of a particular gambling device is not, of itself, to be given the effect of legalizing the ownership and operation of same.'' Compare: Casmus v. Lee, 236 Ala. 396, 183 So. 185, 118 A. L. R. 822, and annotations at pages 833 and 834; 53 C. J. S., Licenses, sec. 28, p. 557, n. 78; 33 Am. Jur., Licenses, sec. 13, p. 334, notes 20 and 21.

In 1947 the state legislative assembly considered the provisions of Chapter 142, Session Laws of 1945, and amended section 4 thereof to provide that all licenses issued shall expire on the first day of January following the issuance thereof and that a full year's license fee shall be charged regardless of when the license is issued. However, the 1947 legislature passed no new legislation nor did it make any clarification of the existing law that may be said to authorize any so-called ''nonprofit organization'' to operate slot machines.

In 1949 the state legislative assembly considered and debated both the existing laws and numerous bills proposed to change such laws relating to slot machines, yet it enacted no legislation either amending the 1945 Act or clarifying the question as to whether it had intended to grant authority to so-called ''nonprofit'' organizations to use or conduct slot machines. On the

contrary, the 1949 legislative assembly enacted Chapter 197, Session Laws of 1949, providing for the submission to the voters of the state of a referendum measure on the question of authorizing the operation of slot machines in the state. Ch. 197, Session Laws of 1949 at pages 467-470.

The 1949 legislative assembly also enacted House Bill No. 450 wherein it recognized and declared the existence of an emergency calling for enforcement of the gambling, slot machine and other criminal laws of the state, for which purpose the legislature appropriated the sum of $40,000 to the attorney general, being a legislative mandate that such official employ so much of the money appropriated as may be necessary to meet the declared emergency so confronting the state. Thus did the 1949 legislature provide the attorney general with money for investigating and prosecuting actions that, *inter alia,* would result in "enforcing the gambling, slot machine and other criminal laws of the State of Montana." Session Laws of 1949 at page 642.

Plaintiff asserts that by the provisions of section 2 of Article XIX of the Constitution of Montana and R. C. M. 1947, section 94-3001 the legislative assembly is without the power to authorize the operation of slot machines, but since neither the provisions of Chapter 142 of the Session Laws of 1945, nor those of any other legislative enactment has declared the operation of slot machines to be lawful in this state, we are not called upon to decide the point so raised on this particular appeal.

Defendants, relying upon Shubat v. Glacier County, 93 Mont. 160, 18 Pac. (2d) 614, urge that all laws imposing a penalty must be strictly construed against such imposition, and that the remedy of abatement, sought herein, is so much greater than the maximum penalty for the misdemeanor, for which the defendants may have been convicted, that it should be the duty of this court to adopt it as a point of reversal, unless the evidence is not overwhelming against the defendants.

The evidence herein clearly shows that the defendants were conducting a nuisance. Moreover, the Shubat case had

nothing to do with abatement or criminal matters but only with a question of taxation. However, it is the duty of the county attorney to commence actions to abate public nuisances, where proper and legal grounds therefor exist. The action may be prosecuted under various sections of the Codes. Actions may be prosecuted under either said section 94-2401 or section 94-2404 of the Revised Codes of 1947, banning gambling, or, as here, under sections 94-1001 et seq. of the Revised Codes of 1947, being the abatement law, or under each and all of such sections as well as other sections of the Codes.

A prosecution under R. C. M. 1947, sections 94-2401 and 94-2404, is for the punishment of the offender, while a prosecution under R. C. M. 1947, section 94-1001 et seq., is for abatement of the gambling nuisance. In the instant case the proceedings were had under the abatement law, and not under the statutes providing for the punishment of the offender by fine and imprisonment, but that the county attorney so proceeded is not a matter of which the defendants may here complain.

The law makes it the duty of every officer authorized to make arrests to seize every slot machine and to bring it before a committing magistrate who must cause the machine to be delivered to the county attorney to be used as evidence on the trial of the person actually or apparently in possession or control thereof and if no such person has been arrested or if arrested he be not held, then the immediate and public destruction of the machine must be ordered. R. C. M. 1947, secs. 94-2410 and 94-2411.

"No person owning or claiming to own any such machine * * * so destroyed, shall have any right of action against any person or against the state, county, or city for the value of such article, or for damages. * * * It shall be the duty of the trial court, after the disposition of the case, and whether the defendant be convicted, acquitted, or fails to appear for trial, to cause the immediate and public destruction of any such article by the sheriff or any other officer or person designated by the court." R. C. M. 1947, sec. 94-2411.

148

. "All moneys seized or taken by any peace officer and confiscated by order of any court by reason of a violation of the gambling laws of the state of Montana, shall be deposited with the county treasurer of the county in which such seizure and confiscation was made, and shall be credited to the poor fund of the county." R. C. M. 1947, sec. 94-2412.

The decree directs the sheriff to *sell* the slot machines so ▇▇▇▇ seized and held by him, but the law imposes upon the trial court the duty to cause the immediate and public *destruction* of the five slot machines, they being contraband and nuisances *per se*, hence the decree should so order and adjudge. Compare: Dorrell v. Clark, supra; State v. Johnson, supra; State v. Las Cruces Elks Club of Benevolent & Protective Order of Elks, supra.

It is therefore ordered that the fourth paragraph of the trial court's decree and judgment be amended to read: "It Is Further Ordered, Adjudged and Decreed that the Sheriff of Fergus county, Montana, immediately take into his possession the five (5) slot machines, together with their contents, that he publicly remove from each of said machines all money therein contained, same to be turned over to the county treasurer of Fergus county, Montana, to be applied by the said county treasurer to the proper fund as provided by law and that said sheriff immediately and publicly destroy and render useless each and every part of each of said slot machines as provided by law."

In it ordered that the decree entered herein as amended to conform herewith be affirmed and that remittitur issue forthwith.

MR. CHIEF JUSTICE ADAIR and MR. JUSTICE METCALF concur.

MR. JUSTICE ANGSTMAN (specially concurring):

I concur in the foregoing opinion and would reach that result for a further reason: We have repeatedly held that if a statute is open to two constructions, one of which would render

it unconstitutional and the other valid, we would adopt the latter construction.

If the laws were interpreted as giving a special privilege to certain select corporations and associations to operate slot machines when denied to others, then they would be unconstitutional as in direct conflict with section 26 of Article V of the Constitution which in part provides: ''The legislative assembly shall not pass local or special laws * * * granting to any corporation, association or individual * * * any special or exclusive privilege, immunity, or franchise whatever.''

It is the general rule that the state ''cannot enact valid criminal laws if such laws make an act done by one penal and impose no penalty upon another for the same act done under like circumstances, or confer the right upon one class of citizens to do an act which is a criminal offense if done by any other class.'' 12 Am. Jur., Constitutional Law, sec. 557, p. 251.

Since the laws may be reasonably construed so as not to conflict with the Constitution we must so interpret them and this is further reason why the foregoing opinion is correct.

MR. JUSTICE FREEBOURN (dissenting):

It is indeed strange that what has been done under license from and by express authority of the state can be held a nuisance.

Such finding is in direct conflict with section 57-104, R. C. M. 1947, providing: ''Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance.''

This is also the general law.

''As a general proposition, it may be stated that the properly doing of that which the law itself expressly or by necessary implication authorizes is not a nuisance, although it be the doing of that which, but for the justification of the law's authority, would be so. The courts will not construe that to be a crime punishable under one statute which was done in the exercise of

powers specifically granted by another statute.'' 46 C. J., Nuisances, sec. 40, p. 672.

''The legislative authority is a complete protection against accountability for a public nuisance from the mere doing of the act, and exempts the person doing it from civil and criminal liability therefor at the suit of the state.'' 39 Am. Jur., Nuisances, sec. 204, p. 480.

It cannot be presumed that the state, after taking the license money from fraternal, religious, charitable and nonprofit organizations and issuing a license therefor, from which a portion of the state's revenue comes, intended that such organizations be found guilty of a crime or nuisance, their property seized and their places of business closed, because of the doing of the licensed act.

''Furthermore, on the ground that it cannot be presumed that the state intends to punish criminally any act which is licensed by its authority, and which it makes a source of a portion of its revenue, it is well settled that where a license tax is imposed on a particular form of gaming, a gambling device, or a gambling house, one who pays the tax cannot be prosecuted for gaming for doing that which is contemplated by the license * * *'' 24 Am. Jur., Gaming and Prize Contests, sec. 10, pp. 404-405.

The 1945 legislative assembly was faced by the illegal slot machine situation, now grown to such proportions that national governmental action has resulted in many states. To eliminate the worse evils, the legislature legalized such machines in fraternal, religious, charitable and nonprofit organizations. Money which otherwise would have left the state remained here to be put to beneficial uses. Some of it to become substantial state revenue, the state collecting during the first six months of 1950, the sum of $498,800 from the sale of slot machine licenses.

The Act, Chapter 142, Session Laws of Montana 1945, legalizing such machines is a valid, workable, subsisting law. It does not provide merely for the payment of license fees and issuance of licenses. It is not a mere licensing statute, not be-

cause there were not legal slot machines to license when the law was enacted, but because it authorizes and sets up the entire machinery for legalizing and licensing the operation of such machines.

The title of the Act calls attention to the fact that the Act is "Repealing All Acts and Parts of Acts in Conflict Herewith." The Act, in part, permits cities and counties to levy a tax on such machines. It provides a different penalty for illegal possession of such machines than existed before such enactment. It provides: "Religious organizations, fraternal organizations, charitable, or nonprofit organizations, before using, operating, keeping and maintaining for use, slot machines, must first procure the license and pay the license fee provided by this act." Sec. 3. Also, that "Any * * * organization which has not been issued a license under this act and which maintains for use or permits the use of any slot machine * * * shall be guilty of a misdemeanor;" sec. 10, that "no slot machine shall hereafter be used, operated, kept or maintained for use or operation within the State of Montana by any person or persons whomsoever save and except as in this act provided," sec. 1, and "all acts or parts of acts in conflict herewith are hereby repealed." Sec. 11.

A reasonable person, after reading this law can only come to the conclusion that the 1945 legislative assembly expressly, and to say the least, by clear and unquestionable implication, authorized the named organizations to possess, own and operate slot machines upon which the license fees were paid and licenses issued therefor.

"Legislative authority of a character to justify conduct that in the judicial view would constitute a nuisance must be express, or must be given by clear and unquestionable implication from the powers expressly conferred, so that it can fairly be said that the legislature contemplated the doing of the very act which occasioned the injury." 39 Am. Jur., Nuisances, sec. 206, p. 483.

Since the defendant organization possessed and operated slot

152

machines upon which the license fees were paid and for which licenses were issued under a valid law permitting and authorizing the same, it cannot now be guilty of a nuisance in possessing and operating such machines.